## BROWN et al. v. STATE.
### No. 31375.

Supreme Court of Mississippi.
April 29, 1935.

For former opinion, see 158 So. 339.

Jno. A. Clark and D. P. Davis, both of De Kalb, and Earl Brewer and W. H. Hewitt, both of Jackson, for appellant.

W. D. Conn, Jr., Asst. Atty. Gen., for the State.

SMITH, Chief Justice.

The judgment herein was affirmed (158 So. 339) on a former day, and we then held that the court below committed no error in admitting in evidence the appellants' confessions, and that its error, if such it was, in admitting certain other evidence, was cured by its being thereafter excluded.

The appellants suggest that we erred in both holdings and also suggest that the judgment should be reversed for other reasons now asserted for the first time, and which will be hereinafter stated.

1. Were the confessions erroneously admitted? When the confessions were offered, the court retired the jury and heard the evidence as to their competency. The appellants introduced no evidence then, as they should have if they desired to challenge the competency of the confessions, and it appeared without conflict from the state's evidence that the confessions had been freely and voluntarily made. Consequently, the court committed no error in admitting them in evidence.

After the state closed its case on the merits, the appellants, for the first time, introduced evidence from which it appears that the confessions were not made voluntarily but were coerced. This evidence was given by the appellants themselves who were in the courtroom during the preliminary inquiry into the competency of the confessions. No request was then or thereafter made that the confessions be excluded from the evidence. We held that, in the absence of such a request, the court was under no duty to exclude the confessions, and therefore could

not be held to have erred in not so doing. In so holding we followed Loftin v. State, 150 Miss. 228, 116 So. 435, which case but announced what, according to 64 C. J. 203, and 26 R. C. L. 1054, and the authorities there cited, is the rule in other jurisdictions. The appellants cite Collins v. State, 100 Miss. 435, 56 So. 527; Butler v. State, 146 Miss. 505, 112 So. 685, and Fisher v. State, 145 Miss. 116, 110 So. 361.

█ In Fisher's Case a confession competent when admitted was afterwards made to appear incompetent, and a motion was then made to exclude it. In Butler's Case the court, after stating that the evidence was insufficient to support the verdict and therefore the judgment of conviction should be reversed, then without necessity therefor proceeded to say: "We can only account for the verdict * * * on the theory that the state's witness * * * stated * * * that his father owned a large plantation and employed considerable labor in the community, and that the defendant was a bad negro, and that he wanted to get rid of him. This statement was not objected to, nor was any motion made to exclude it, and of course we cannot consider it as error per se." After again stating that the evidence accounted for the verdict, the court said: "It should have been excluded, although not objected to." It is hardly probable that a division of the court there intended to overrule the court's long unbroken line of decisions, beginning with Skinner v. Collier, 4 How. 396, that the incompetency of evidence not objected to was waived and that error could not thereafter be based thereon. Moreover, this rule has been enforced since Butler's Case was decided, not only in Loftin's Case, supra, but also in Palmer v. Fair Co., 140 Miss. 294, 105 So. 513. In Collins' Case language used by counsel in an argument to the jury was held to be improper, and, while the court did say that it was the duty of the trial judge sua sponte to instruct the jury that such remarks were improper and that they in their deliberations should not be governed by any such statements, the holding was beyond the requirements of the case, for the argument was objected to when made. The duty of a court sua sponte to control the argument of counsel runs parallel in our decisions with the absence of a duty to exclude evidence not objected to. See cases cited in the Collins' opinion.

Even where the court reserves its ruling on the admissibility of evidence when objection thereto is made, and fails thereafter to rule on it, no complaint thereof can be made in the absence of a request made after the reservation for a ruling on the objection. Mallory v. Walton, 119 Miss. 396, 81 So. 113. We must decline to overrule Loftin's Case and apply here a rule different from the rule applied there.

We are not here confronted with a case where the court was not legally organized or its functions interfered with by violence or threats thereof.

2. Was the admission of certain evidence said by the appellants to have been incompetent cured by its later exclusion? We adhere to our former ruling without further discussion thereof.

The questions here raised for the first time on the suggestion of error are: (1) The failure of the court below to exclude the confessions after the introduction of evidence tending to show that they were coerced, although not requested so to do, violates sections 14 and 26 of our state Constitution and the first section of the Fourteenth Amendment to the Federal Constitution. (2) The indictment was received and the case tried at a time when the court below had lost the power so to do. (3) The appellants were tried before the indictment was returned or the homicide committed. (4) The name of the foreman of the grand jury was not indorsed on the indictment as required by section 1198, Code of 1930. (5) The record does not disclose that the grand jurors who returned the indictment or that the petit jurors who tried the case were sworn.

██ 3. Was section 26 of the state Constitution violated by the admission of the confessions? This section, as does the common law, provides that "in all criminal prosecutions the accused * * * shall not be compelled to give evidence against himself." We will assume that the admission in evidence, over the objection of the accused, of a confession coerced by violence is forbidden by this section of the constitution. Jordan v. State, 32 Miss. 382; Whip v. State, 143 Miss. 757, 109 So. 697; but see 2 Wigmore on Evidence (2d Ed.) § 823. This rule against self-crimination is not an absolute immunity, but is simply a privilege, though sacred and important, of which the accused may avail himself or not at his pleasure. It may be, and is, waived unless specifically claimed. 70 C. J. 746; 4 Wigmore on Evidence (2d Ed.) § 2275; 6 Jones on Evidence (2d Ed.) § 2489; Decell v. Lewenthal, 57 Miss. 331, 34 Am. Rep. 449; Spight v. State, 120 Miss. 752, 83 So. 84.

This record discloses no objection to the confessions on the ground of self-crimination,

but, aside from that, they were competent when admitted, and, although the appellants had the right and an opportunity so to do, no request to exclude them was made after evidence tending to show their incompetency was introduced.

■ 4. Was section 14 of the state Constitution and section 1 of the Fourteenth Amendment to the Federal Constitution violated by the admission of the confessions? These sections provide that "no person shall be deprived of life, liberty or property, except by due process of law." Immunity from self-crimination is not essential to due process of law. Twining v. New Jersey, 211 U. S. 78, 29 S. Ct. 14, 25, 53 L. Ed. 97; Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674, 90 A. L. R. 575. We can add nothing to the discussion of this question that appears in the Twining Case, wherein it was said: "Salutary as the principle may seem to the great majority, it cannot be ranked with the right to hearing before condemnation, the immunity from arbitrary power not acting by general laws, and the inviolability of private property. The wisdom of the exemption has never been universally assented to since the days of Bentham, many doubt it to-day, and it is best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient. See Wigmore, Ev. § 2251. It has no place in the jurisprudence of civilized and free countries outside the domain of the common law, and it is nowhere observed among our own people in the search for truth outside the administration of the law. It should, must, and will be rigidly observed where it is secured by specific constitutional safeguards, but there is nothing in it which gives it a sanctity above and before constitutions themselves." The opinion in that case sets forth the history of this privilege (as does Wigmore, op. cit. § 2250 et seq.) disclosing its comparatively modern origin and its absence from our early colonial jurisprudence.

■■ If the appellants mean to say that the failure of the court below to exclude their confessions after the introduction of evidence tending to show their incompetency, although not requested so to do, deprived them of their life or liberty without due process of law, there can be no merit therein. That procedure was in accord with that applicable to all civil and criminal trials, recognized in all common-law jurisdictions, and did not result in arbitrarily depriving the appellants of any constitutional or common-law right. This is all that the due process clauses of the two Constitutions require. The authorities in support hereof are so numerous as to make their citation supererogatory. Moreover, if the court below had erroneously overruled a motion to exclude these confessions, its ruling would have been mere error reversible on appeal, but would not have constituted denial of due process of law. Jones v. Buffalo Creek Coal & Coke Co., 245 U. S. 328, 38 S. Ct. 121, 62 L. Ed. 325; Central Land Co. v. Laidley, 159 U. S. 103, 16 S. Ct. 80, 40 L. Ed. 91; Bonner v. Gorman, 213 U. S. 86, 29 S. Ct. 483; 53 L. Ed. 709; Corrigan v. Buckley, 271 U. S. 323, 46 S. Ct. 521, 70 L. Ed. 969; American Railway Express Co. v. Kentucky, 273 U. S. 269, 47 S. Ct. 353, 71 L. Ed. 639.

Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. ——, is cited and relied on by the appellants, but its relevancy here is not apparent. There the charge was that Mooney was convicted on perjured evidence, known to be such by the prosecuting officer, who suppressed evidence, unknown to Mooney, in impeachment thereof. No charge either of perjury or the suppression of evidence is here made. On the contrary, all of the facts as to the confessions being coerced were known to the appellants when they were offered and were provable by their own personal testimony.

■ 5. When the court below received the indictment and tried the case on its merits, had it lost the power so to do? The court met in regular session on Monday, the 19th day of March, A. D. 1934, and was authorized by section 473, Code of 1930, to remain in session for twelve days. Before the expiration of this twelve days an order was duly entered on the minutes of the court in accordance with the provisions of section 732, Code of 1930, extending the term thereof for two weeks. The grand jury had been discharged, but was recalled by the court after the beginning of the extended portion of the term, returned the indictment herein, and the case was tried during the extended portion of the term. Section 732, Code of 1930, provides that "all courts, the terms of which may be continued or extended shall possess and may exercise all the powers exercisable by the same at or during the term, or terms, which may have been so continued, or extended." As we understand the appellants' contention, it is that the statute does not authorize a court to deal in any way during the extended portion of its term with any matters that were not before it prior to the extension of the term. We cannot agree with this. The purpose of the statute is to authorize the courts to extend their regular terms and to do

any and all things during the extended portion thereof that they could have done prior thereto. The order extending the court's term is as follows: "It appearing to the court that the business of the court makes it advantageous and proper to extend this term of court for two weeks so that the court may be able to take care of the business now before it. It is therefore ordered that this term of Court be and the same is hereby extended for two weeks, through Saturday, April 14, 1934." The appellants say that this order limits the power of the court during the extended portion of its term to the dealing with such matters only as were before it when the order was entered. The power of the court at an extended term is fixed by the statute, and can neither be limited nor enlarged by any order of the court.

■■■ 6. Were the appellants tried before the indictment was returned or the homicide committed? This contention is based solely on a manifest clerical error in the caption to the stenographer's transcript of the evidence. This caption recites that the cause came on to be heard "on the 25th day of March, 1934." That day was Sunday, and prior to the beginning of the extended portion of the term. A recital in the caption to a transcript of the evidence in a case, if in conflict with the record of the trial, does not control, and it is manifest from the record that the indictment was returned after the homicide was committed.

■■■ 7. Can the appellants now complain of the failure of the foreman of the grand jury to endorse his name on the indictment? An objection to the failure of the foreman of a grand jury to endorse his name on an indictment must be made in the court below and cannot be made in this court for the first time. Pruitt v. State, 163 Miss. 47, 139 So. 861.

■■■ 8. Does the record disclose that the grand and petit juries were sworn, and, if not, can the appellants' objection thereto be here considered? The transcript of the record does not contain the minutes of the court impaneling the grand jury, but the indictment recites that the grand jury was duly impaneled and sworn, as also does the order of the court, made after the grand jury was discharged, directing it to reassemble. This would seem to be sufficient evidence that the grand jury was in fact sworn, but, aside from that, no objection thereto was made in the court below, and cannot be made here for the first time. Marley v. State, 109 Miss. 717, 69 So. 210. For the same reason, the objection that the petit jury was not sworn cannot be here

considered. Hill v. State, 112 Miss. 375, 73 So. 66; Cummings v. State (Miss.) 155 So. 179; sections 1193 and 3403, Code of 1930. Moreover, it does not here affirmatively appear that the grand and petit juries were not sworn. Hays v. State, 96 Miss. 153, 50 So. 557; McFarland v. State, 110 Miss. 482, 70 So. 563.

■■■ 9. The appellants have filed what they designate as a motion in arrest of judgment, wherein they set forth matters said to have occurred on the trial which do not appear in the record. A motion in arrest of judgment will not lie in the Supreme Court. It reviews only the rulings of the court below complained of in an assignment of error, and in so doing is confined to an examination of the record made in the court below. It is not a court of original jurisdiction, but of appellate jurisdiction only, and therefore we cannot here examine or consider the allegations in the motion for arrest of judgment, nor the affidavits filed in support thereof.

10. Much is said in the brief of counsel for the appellants in support of the suggestion of error to the effect that these appellants are negroes and "stood before the trial court as helpless to defend themselves as sheep in a slaughter pen." In justice to the court below, we must say that this charge is not even remotely supported by the record. It is based probably on things stated in ex parte affidavits in support of the motion in arrest of judgment which have no place in this discussion.

Again they say that the court below failed "to provide counsel, in reality, to defend" the appellants, and "surely it is cruel folly for the State to contend, in a court of justice, that these negroes are to be bound by the strictest and most technical rules of practice and pleading—and this after their right to counsel has been effectively denied." No request was made of the court to continue the case, to pass it to a later day, or to grant the appellants any further time for the preparation of their case.

The attorneys who defended the appellants in the court below are able lawyers of extensive practice, veterans of many forensic conflicts; and the record does not disclose that they consciously failed to discharge any duty they owed the appellants.

The rules of procedure here applied are technical only in the sense that all such rules are, and what the appellants request is simply that they be excepted from the procedure heretofore uniformly applied to all litigants. This we cannot do. All litigants, of every

race or color, are equal at the bar of this court, and we would feel deeply humiliated if the contrary could be justly said.

Nothing herein said is intended to even remotely sanction the method by which these confessions were obtained.

The suggestion of error will be overruled, and the sentence will be executed on Thursday, the 6th day of June, 1935.

So ordered.

GRIFFITH, Justice (dissenting).

The crime with which these defendants, all ignorant negroes, are charged, was discovered about 1 o'clock p. m. on Friday, March 30, 1934. On that night one Dial, a deputy sheriff, accompanied by others, came to the home of Ellington, one of the defendants, and requested him to accompany them to the house of the deceased, and there a number of white men were gathered, who began to accuse the defendant of the crime. Upon his denial they seized him, and with the participation of the deputy they hanged him by a rope to the limb of a tree, and, having let him down, they hung him again, and when he was let down the second time, and he still protested his innocence, he was tied to a tree and whipped, and, still declining to accede to the demands that he confess, he was finally released, and he returned with some difficulty to his home, suffering intense pain and agony. The record of the testimony shows that the signs of the rope on his neck were plainly visible during the so-called trial. A day or two thereafter the said deputy, accompanied by another, returned to the home of the said defendant and arrested him, and departed with the prisoner towards the jail in an adjoining county, but went by a route which led into the state of Alabama; and while on the way, in that state, the deputy stopped and again severely whipped the defendant, declaring that he would continue the whipping until he confessed, and the defendant then agreed to confess to such a statement as the deputy would dictate, and he did so, after which he was delivered to jail.

The other two defendants, Ed Brown and Henry Shields, were also arrested and taken to the same jail. On Sunday night, April 1, 1934, the same deputy, accompanied by a number of white men, one of whom was also an officer, and by the jailer, came to the jail, and the two last named defendants were made to strip and they were laid over chairs and their backs were cut to pieces with a leather strap with buckles on it, and they were likewise made by the said deputy definitely to understand that the whipping would be continued unless and until they confessed, and not only confessed, but confessed in every matter of detail as demanded by those present; and in this manner the defendants confessed the crime, and, as the whippings progressed and were repeated, they changed or adjusted their confession in all particulars of detail so as to conform to the demands of their torturers. When the confessions had been obtained in the exact form and contents as desired by the mob, they left with the parting admonition and warning that, if the defendants changed their story at any time in any respect from that last stated, the perpetrators of the outrage would administer the same or equally effective treatment.

Further details of the brutal treatment to which these helpless prisoners were subjected need not be pursued. It is sufficient to say that in pertinent respects the transcript reads more like pages torn from some mediaeval account than a record made within the confines of a modern civilization which aspires to an enlightened constitutional government.

All this having been accomplished, on the next day, that is, on Monday, April 2, when the defendants had been given time to recuperate somewhat from the tortures to which they had been subjected, the two sheriffs, one of the county where the crime was committed, and the other of the county of the jail in which the prisoners were confined, came to the jail, accompanied by eight other persons, some of them deputies, there to hear the free and voluntary confession of these miserable and abject defendants. The sheriff of the county of the crime admitted that he had heard of the whipping, but averred that he had no personal knowledge of it. He admitted that one of the defendants, when brought before him to confess, was limping and did not sit down, and that this particular defendant then and there stated that he had been strapped so severely that he could not sit down, and, as already stated, the signs of the rope on the neck of another of the defendants was plainly visible to all. Nevertheless the solemn farce of hearing the free and voluntary confessions was gone through with, and these two sheriffs and one other person then present were the three witnesses used in court to establish the so-called confessions, which were received by the court and admitted in evidence over the objections of the defendants duly entered of record as each of the

said three witnesses delivered their alleged testimony. There was thus enough before the court when these confessions were first offered to make known to the court that they were not, beyond all reasonable doubt, free and voluntary; and the failure of the court then to exclude the confessions is sufficient to reverse the judgment, under every rule of procedure that has heretofore been prescribed, and hence it was not necessary subsequently to renew the objections by motion or otherwise.

The spurious confessions having been obtained—and the farce last mentioned having been gone through with on Monday, April 2d—the court, then in session, on the following day, Tuesday, April 3, 1934, ordered the grand jury to reassemble on the succeeding day, April 4, 1934, at 9 o'clock, and on the morning of the day last mentioned the grand jury returned an indictment against the defendants for murder. Late that afternoon the defendants were brought from the jail in the adjoining county and arraigned, when one or more of them offered to plead guilty, which the court declined to accept, and, upon inquiry whether they had or desired counsel, they stated that they had none, and did not suppose that counsel could be of any assistance to them. The court thereupon appointed counsel, and set the case for trial for the following morning at 9 o'clock, and the defendants were returned to the jail in the adjoining county about thirty miles away.

The defendants were brought to the courthouse of the county on the following morning, April 5th, and the so-called trial was opened, and was concluded on the next day, April 6, 1934, and resulted in a pretended conviction with death sentences. The evidence upon which the conviction was obtained was the so-called confessions. Without this evidence, a peremptory instruction to find for the defendants would have been inescapable. The defendants were put on the stand, and by their testimony the facts and the details thereof as to the manner by which the confessions were extorted from them was fully developed, and it is further disclosed by the record that the same deputy, Dial, under whose guiding hand and active participation the tortures to coerce the confessions were administered, was actively in the performance of the supposed duties of a court deputy in the courthouse and in the presence of the prisoners during what is denominated, in complimentary terms, the trial of these defendants. This deputy was put on the stand by the state in rebuttal, and admitted the whippings. It is interesting to note that in his testimony with reference to the whipping of the defendant Ellington, and in response to the inquiry as to how severely he was whipped, the deputy stated, "Not too much for a negro; not as much as I would have done if it were left to me." Two others who had participated in these whippings were introduced and admitted it—not a single witness was introduced who denied it. The facts are not only undisputed, they are admitted, and admitted to have been done by officers of the state, in conjunction with other participants. and all this was definitely well known to everybody connected with the trial, and during the trial, including the state's prosecuting attorney and the trial judge presiding.

We have already mentioned that counsel were appointed on the afternoon before the trial opened on the following morning, and that in the meantime the prisoners had been taken away to an adjoining county. Counsel were thus precipitated into the case and into the trial without opportunity of preparation either as to the facts or the law. Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 165, 84 A. L. R. 527. Without having had opportunity to prepare, they assumed—erroneously as the majority now say—that the objections interposed when the so-called confessions were being introduced in chief were technically sufficient, and did not later move to exclude them when, under the undisputed testimony and the admissions of the state itself, it was fully developed that the confessions had been coerced, and that they were not receivable as evidence; and now the case of Loftin v. State, 150 Miss. 228, 116 So. 435, is seized upon as a means of sanctioning the appalling violation of fundamental constitutional rights openly disclosed by this record, undisputed and admitted.

The case of Loftin v. State, when carefully examined, is not the case now before us, and ought not to be forced into service under the facts now being considered. No officer of the state had any part in the confessions in that case, the prosecuting officer of the state did not use the confession, knowing it was coerced, the weight of the testimony was that the confession was actually and in fact voluntary. The case now before us is thus separated from the Loftin Case, in vital principle, as far as the east from the west. The case which is applicable and ought to be controlling here is Fisher v. State, 145 Miss. 116, 110 So. 361, 365. There the alleged confession was obtained in the jail by torture in the presence of the sheriff. Defendant's counsel

did not object as he should have done under the rules of procedure when the confession was offered and admitted, but later and out of time moved to exclude. The conviction was sought to be maintained, as in the case now before us, on the ground that the defendant had not raised or interposed his objection to the alleged confession in the manner required by the procedural law. In reversing the sentence this court in banc said: "Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them in trials has been the curse of all countries. It was the chief iniquity, the crowning infamy of the Star Chamber, and the Inquisition, and other similar institutions. The Constitution recognized the evils that lay behind these practices and prohibited them in this country. * * * The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure, and wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective." See, also, People v. Winchester, 352 Ill. 237, 245, 185 N. E. 580; State v. Griffin, 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227; Williams v. U. S. (C. C. A.) 66 F.(2d) 868; Booth v. U. S. (C. C. A.) 57 F.(2d) 192, 197; Addis v. U. S. (C. C. A.) 62 F.(2d) 329; Commonwealth v. Belenski, 276 Mass. 35, 176 N. E. 501; Mack v. State, 203 Ind. 355, 180 N. E. 279, 83 A. L. R. 1349; Hagood v. Commonwealth, 157 Va. 918, 162 S. E. 10, 601; State v. Hester, 137 S. C. 145, 162, 134 S. E. 885; O'Steen v. State, 92 Fla. 1062, 1075, 111 So. 725; People v. Brott, 163 Mich. 150, 128 N. W. 236; People v. Bartley, 12 Cal. App. 773, 108 P. 868, 870; State v. Frost, 134 Wash. 48, 50, 234 P. 1021.

To my mind it would be as becoming a court to say that a lynching party has become legitimate and legal because the victim, while being hung by the mob, did not object in the proper form of words at precisely the proper stage of the proceedings. In my judgment there is no proper form of words, nor any proper stage of the proceedings in any such case as the record of the so-called trial now before us discloses; it was never a legitimate proceeding from beginning to end; it was never anything but a fictitious continuation of the mob which originally instituted and engaged in the admitted tortures. If this judgment be affirmed by the federal Supreme Court, it will be the first in the history of that court wherein there was allowed to stand a conviction based solely upon testimony coerced by the barbarities of executive officers of the state, known to the prosecuting officers of the state as having been so coerced, when the testimony was introduced, and fully shown in all its nakedness to the trial judge before he closed the case and submitted it to the jury, and when all this is not only undisputed, but is expressly and openly admitted. Cf. Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. ——. The Scottsboro Cases [1] are models of correct constitutional procedure as compared with this now before the court. In fundamental respects, it is no better than the case reviewed in Moore v. Dempsey, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543, wherein the formal court procedure was without defect, but the judgment was vitiated by the substance of what actually lay behind it.

It may be that in a rarely occasional case which arouses the flaming indignation of a whole community, as was the case here, we shall continue yet for a long time to have outbreaks of the mob or resorts to its methods. But, if mobs and mob methods must be, it would be better than their existence and their methods shall be kept wholly separate from the courts; that there shall be no blending of the devices of the mob and of the proceedings of the courts; that what the mob has so nearly completed let them finish; and that no court shall by adoption give legitimacy to any of the works of the mob, nor cover by the frills and furbelows of a pretended legal trial the body of that which in fact is the product of the mob, and then, by closing the eyes to actualities, complacently adjudicate that the law of the land has been observed and preserved.

ANDERSON, J., concurs in this dissent.

---

[1] See Patterson v. State, 224 Ala. 531, 141 So. 195; Powell v. State, 224 Ala. 540, 141 So. 201, Weems v. State, 224 Ala. 524, 141 So. 215, reversed Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527; Norris v. State (Ala. Sup.) 156 So. 556, reversed 55 S. Ct. 579, 79 L. Ed. ——; Patterson v. State (Ala. Sup.) 156 So. 567, reversed 55 S. Ct. 575, 79 L. Ed. ——.